IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 15, 2021

## STATE OF TENNESSEE v. KRISTOPHER MICHAEL MARTIN

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2017-CR-440     Jill Bartee Ayers, Judge**

_____

### No. M2020-01384-CCA-R3-CD

_____

The Defendant, Kristopher Michael Martin, was convicted by a jury of second-degree murder, for which he received a sentence of twenty years. See Tenn. Code Ann. § 39-13-210.  On appeal, the Defendant argues that the trial erred in applying enhancement factors and that the trial court erred in failing to consider mitigating factors.  See Tenn. Code Ann. §§ 40-35-113, -13-114.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Taylor Robinson Dahl, Clarksville, Tennessee, for the appellant, Kristopher Michael Martin.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

The case arises out of allegations that the Defendant murdered Billy Pace, Jr., in the first degree, on December 16, 2016.  The Defendant's case proceeded to a jury trial on September 16, 2019.

At trial, Michelle Martin, the Defendant's mother, testified that in December 2016, she lived with the Defendant in a mobile home. At this time, the Defendant was seventeen years old. Ms. Martin asserted that she and the Defendant were very close. Ms. Martin recalled that during this time, the Defendant worked at the Clarksville Speedway in the concession booth on the weekends. Additionally, he worked for a neighbor doing "odd-and-end things just to keep busy." She testified that she did not knowingly keep firearms in her home.

She asserted that the Defendant was friends with the victim and that the two would play video games and watch movies. The victim would occasionally stay at the residence overnight, and he would comment about how he enjoyed staying over and that he felt it was a quiet and safe space. Ms. Martin did not like the victim upon their first meeting and described him as "gang-like." However, after spending more time together, she described the victim as "a sweet kid." Ms. Martin did not witness the Defendant and the victim fight or argue.

Ms. Martin testified that the Defendant was dating Jessica Simo's[1] minor daughter, B.S.,[2] in December 2016. Ms. Martin had driven the Defendant to Ms. Simo's residence on "a few occasions" to visit with B.S. and had even delivered a box of food for the benefit of Ms. Simo and B.S. At some point, Ms. Martin received a phone call from the Department of Children's Services ("DCS") asking if she could house B.S. because B.S. was being removed from Ms. Simo's custody. She did not agree to take custody of B.S.

On December 15, 2016, Ms. Martin recalled that although she had told the Defendant that the victim could not stay overnight at the mobile home, she changed her mind before going to bed. The next morning, she was surprised to see Ms. Simo in the mobile home. Upon questioning, Ms. Simo informed Ms. Martin that the Defendant and the victim would not allow her to leave the night before because she was "so upset." Ms. Martin did not know why Ms. Simo was upset.

The victim and Ms. Simo left the residence before the Defendant came home from school around midday, but they returned about half an hour later. Ms. Martin testified that Ms. Simo had asked the Defendant to go with her and help her pack because she was moving to Virginia Beach with the victim. Although Ms. Martin gave the Defendant permission to help Ms. Simo "pack her car," she asked the Defendant why the victim was not helping, and the Defendant asserted that the victim "was not allowed at [Ms.Simo's] brother's house." The victim stayed at Ms. Martin's residence following the Defendant

---

[1] Jessica Simo is referred to as "Summer Semo," "Ms. Semo," and "Ms. Simo" throughout the record, we have chosen to use the name Jessica Simo for continuity.

[2] It is the custom of this court to use initials to identify minors, we mean no disrespect.

and Ms. Simo's departure to her brother's house. Soon after, while speaking to Ms. Martin, the victim mentioned that he was not sure he wanted to leave with Ms. Simo, referencing the move to Virginia Beach.

Later the same day, the Defendant called Ms. Martin from a Walmart and asked her if she had seen the victim; she responded that she had not seen him. Ms. Martin soon received a text message from B.S. asking if she had spoken with the Defendant; she responded that she had just spoken with the Defendant and that he was at Walmart with Ms. Simo.

A few days later, an investigator informed Ms. Martin and the Defendant that the victim's body had been found near their mobile home. Ms. Martin described the Defendant's reaction as "petrified." She testified that the Defendant denied shooting the victim.

James Hines testified that he owned several mobile homes and trailers on Ross Lane, including the home adjacent to Lot 20 where the Defendant and Ms. Martin lived. Mr. Hines' mother lived in the adjacent mobile home in December 2016, and he recalled seeing a red car with a "bag tied on top" parked in front of the Defendant's residence during the weekend of December 15, 2016. Mr. Hines recognized the woman driving, but he had only "seen her a couple of times." He testified that he saw the Defendant "running beside the trailer around to the front" and saw him "jump[] into the passenger seat" of the red car.

B.S. testified that she had dated the Defendant in 2016 and had known him for a year and one half to two years before the incident. She met the Defendant in school when she was around fifteen years old and the Defendant was around seventeen years old. B.S.'s first interaction with DCS occurred in the fall of 2015. B.S.'s father "was verbally and physically abusive" and "was on drugs," and he was eventually arrested. Following her father's arrest, B.S. lived with her mother. During this time, Ms. Simo began a relationship with the victim. B.S. characterized Ms. Simo's relationship with the victim as "happy," but B.S. insisted that the relationship "pushed" Ms. Simo and B.S. apart. B.S. and the victim engaged in a physical altercation preceding B.S.'s removal from Ms. Simo's custody.

After her removal, B.S. asserted that she did not communicate with the victim and did not speak to Ms. Simo for months. B.S. did not know her mother planned to move to Virginia Beach until "[j]ust before [she] left." While in foster care, B.S. was not allowed to visit the Defendant because Ms. Simo had once contacted her while she was at the Defendant's residence.

On the night of December 16, 2016, B.S. received a text message from the Defendant stating, "If I don't – if I didn't [shoot him], he was going to shoot me and [Ms. Simo]." The same night, B.S. received a voicemail from the Defendant that stated he "broke a promise and that [the Defendant] loved [B.S.]." B.S. and the Defendant had a

telephone conversation later that night, and he admitted to shooting the victim twice with Ms. Simo's Springfield Armory 1911 firearm. According to B.S., the Defendant shot the victim once and then shot him again because the Defendant could tell the victim "was in pain." She testified that the Defendant claimed that the victim had tried to pull a firearm and "was acting crazy like he was [going to] do something." She asserted that the incident happened behind the Defendant's mobile home.

Oscar Roman testified that he occasionally lived with Ms. Martin and the Defendant and that he resided there on December 16, 2016. The following day, Mr. Roman recalled that he and the Defendant had a conversation about a firearm that the Defendant had in his bedroom. Mr. Roman asserted that the Defendant stated that the gun had been left at the mobile home and that he intended to sell it. The Defendant attempted to sell the "nine-millimeter" gun to Mr. Roman, but Mr. Roman refused. He recalled that the Defendant then returned the gun to his room.

Lieutenant William Wall testified he worked for the Montgomery County Sheriff's Office ("MCSO") as the lead investigator in the disappearance of the victim. On December 19, 2016, after contacting the victim's father, Lieutenant Wall received information that led him to the Defendant's address. He asserted that the Defendant told him that Ms. Simo and the victim had stayed at the residence a few nights before, but that the two had since left on a trip to Virginia.

Lieutenant Wall testified that he visited the Defendant for a second time on December 21 and asked Ms. Martin if he could look around the mobile home. Upon receiving permission, he walked to the wood line around the side of the home and discovered a walking trail where he noticed "a little disturbance of leaves, a path." Upon closer inspection, he saw two black boots protruding from a pile of leaves with the remainder of the victim's body hidden under the pile. He called for backup and returned to the mobile home to inform Ms. Martin and the Defendant of his findings.

He testified that upon hearing the news, the Defendant mentioned that the victim may have been suicidal, but that the Defendant mostly did not respond. Lieutenant Wall stated that the Defendant initially denied having knowledge of any handgun in the home, but after discovery of the gun in his bedroom, he insisted that the gun belonged to Oscar Roman. The Defendant eventually admitted to possessing the gun and attempting to sell it to Mr. Roman.

Lieutenant Wall obtained a written statement from the Defendant. In the statement, the Defendant claimed that the victim and Ms. Simo came to his mobile home on December 15, 2016, around 11:30 p.m., and the Defendant and Ms. Simo attempted to calm the victim down when he began talking about suicide. The next day, the Defendant and Ms. Simo went to her brother's house to pack her car for a trip to Virginia, and upon returning to the

mobile home, the victim was gone. Ms. Simo left for Virginia alone. In the statement, the Defendant admitted that he attempted to sell the gun after finding it in the mobile home.

Jesse Hedrick was employed with the MCSO and testified that he was tasked with interviewing neighbors and searching the Defendant's mobile home located at Lot 21 on Ross Lane. The Defendant's mother gave Officer Hedrick permission to search the mobile home, and in the Defendant's bedroom, he discovered the nine-millimeter Taurus Millennium G2 semiautomatic pistol with a magazine and one nine-millimeter round. He also found the victim's backpack in the Defendant's mobile home.

Cody Lannom, a member of Montgomery County's Crime Scene Team, testified that he was called on December 21, 2016, to respond to the Defendant's residence. Using a metal detector, Officer Lannom and his team identified the place where the shooting of the victim occurred, recovered two .45 caliber rounds, one spent .45 caliber round, and one "copper jacketing for a .45 caliber projectile." He also identified photographs depicting reddish-brown stains on swabs taken from the scene and photographs taken from multiple angles depicting the victim's body.

Tommy Heflin testified that he worked at the Tennessee Bureau of Investigation ("TBI") for over thirty-five years as a special agent forensic scientist. He identified a .45 caliber pistol and several rounds of ammunition found at the scene. Additionally, he examined the hooded sweatshirt that the victim was wearing at the time of the incident and identified two bullet holes. He determined that a gun was fired within four feet of the victim and that the sweatshirt contained partially-burned gunpowder.

Mark Dunlap testified that he had worked in the TBI crime lab as a special agent forensic scientist for over nineteen years. He gathered swabs of blood from the pistol grip and multiple magazines. After testing, Agent Dunlap determined that all samples matched the victim's DNA profile. He did not find any blood or DNA profiles to match that of the Defendant.

Debra Kolofsky testified that she worked for the Clarksville Police Department as a detective. She was able to view and analyze data linked to the Defendant's email address and was able to identify the December 16, 2016 text message from the Defendant to B.S. Additionally, she was able to identify a phone call made from the Defendant's phone to Ms. Simo's phone on December 18, 2016, for a duration of twenty-three minutes.

Doctor Miguel Laboy testified that he was employed as the Nashville Forensic Center medical examiner for five years. Dr. Laboy performed an autopsy on the victim and determined that the victim had a gunshot wound to the inferior left temporal scalp and that a bullet was recovered from the right side of the victim's face. A second bullet was recovered from the left side of the victim's head. Dr. Laboy concluded that the cause of death was "gunshot wounds to the head" and that the manner of death was homicide. On cross-examination, Dr. Laboy testified that he could not distinguish which gunshot wound

would have been fatal. He similarly could not distinguish how far away the shooter was when the gunshots were fired.

Richie Armstrong testified that he was a cellmate with the Defendant while in Montgomery County Jail. Upon becoming cellmates, Mr. Armstrong asserted that he had asked the Defendant if he had committed the murder as charged. Mr. Armstrong testified that the Defendant denied committing the murder initially, but that he later admitted "[y]eah, I did it" after Mr. Armstrong insisted that the Defendant "stop bull----ing[.]" The Defendant admitted to Mr. Armstrong that he was having a sexual relationship with Ms. Simo and that she was insistent that she wanted her relationship with the victim to end. He asserted that the Defendant would leave school to go to Ms. Simo's house to "do []little odd-end jobs" and that the two would have sexual relations. The Defendant explained that Ms. Simo told the Defendant "[w]e have to do it," referring to murdering the victim, while the two were packing at her brother's house. She insisted that the Defendant make the incident "look like a suicide." Mr. Armstrong stated that upon returning to the mobile home, the Defendant asked the victim to "go on a walk" because the two would often go out to the back of the mobile home and shoot guns for "target practice[.]" Once out back, the victim raised his gun to begin target practice and the Defendant pulled Ms. Simo's gun out of his waistband and shot the victim in the back of the head. Mr. Armstrong testified that the victim fell and the Defendant shot him again.

Mr. Armstrong stated that after the Defendant shot the victim, he pulled the body deeper into the woods and stated that he was not "worried about fingerprints." The Defendant returned to the mobile home and handed the gun to Ms. Simo. She placed the gun in her purse, and the Defendant wrapped the victim's gun in a piece of clothing or cloth and placed it in a bin in his closet.

Mr. Armstrong stated that although he had a pending case, he did not receive anything in exchange for his testimony. However, on cross-examination, he agreed that he gave a statement against the Defendant the day before he was released on bond. He had been charged with aggravated assault, aggravated kidnapping, and aggravated robbery, and he had previously been convicted.

The Defendant testified that he had known the victim for about a year before his death. He met the victim when Ms. Simo and B.S. came to his house to pick him up, and that the victim was dating Ms. Simo at the time. The two became friends and started to speak regularly. The victim began to stay the night with the Defendant around "the end of [the] summer" in 2016. The Defendant asserted that his mother did not like the victim initially; however, the Defendant looked up to the victim "as a big brother." He described the victim as "a good person" and "respectful, calm." The two never had an altercation, but he recalled that the victim could "get hotheaded" and could "have a temper." He had witnessed the victim and Ms. Simo argue and yell at each other.

The Defendant met B.S. at school when he was a sophomore, and she was a freshman. The two were friends before they began dating around September 2016. They spoke every day by way of phone calls or through text messages. After the Defendant left school, the two would see each other on the weekends. The Defendant did not have a car, so his mother or Ms. Simo would provide transportation for the two.

The Defendant testified that he met Ms. Simo by way of his relationship with B.S. He asserted that Ms. Simo did not have many rules for B.S. and that Ms. Simo would sometimes "act like her best friend." The Defendant denied having a relationship with Ms. Simo and stated that the two did not have sex.

The Defendant testified that on December 15, 2016, he received a panicked phone call from the victim. The victim asked to stay with the Defendant that night because he had been in an argument with his parents and did not want to go home. The Defendant called to ask for Ms. Martin's permission, and she eventually relented. The victim could not stay with Ms. Simo because she had been "evicted out of her trailer and she would bounce around between her brother's house and somewhere else."

Upon arrival to the Defendant's residence, the victim asked if Ms. Simo could also sleep at the mobile home for the night. The victim did not want Ms. Simo to "drive in the condition that she was in[.]" The Defendant described Ms. Simo as "upset." The Defendant asserted that Ms. Simo "always had her gun with her," usually in her purse, and the victim "told [the Defendant] he had the [] nine-millimeter [firearm]."

The next morning, the Defendant left for school and returned to the mobile home around 12:30 or 1:00 p.m. Ms. Simo asked the Defendant if he "was still going to help her pack her car up," and the two left to go to Ms. Simo's brother's house. While packing, the Defendant asserted that Ms. Simo acted "weird" and stated that "if [the trip] didn't work out that she was contemplating whether or not to kill herself[.]" Ms. Simo was worried about taking the victim with her on the trip.

The Defendant and Ms. Simo arrived back at the mobile home around 5:00 p.m. and found the victim who "seemed frustrated." The victim and Ms. Simo walked outside, and the Defendant went to his bedroom. While in his bedroom, the Defendant testified that he heard two gunshots; however, according to the Defendant, gunshots in that neighborhood were not uncommon, and he was not startled. The Defendant left his bedroom and walked outside. He found Ms. Simo "in the woods," and she was "screaming [that] she needed help." The Defendant followed Ms. Simo, and he saw the victim on the ground. The Defendant did not think the victim was dead but that "maybe he had [fallen] and hurt himself." Upon closer inspection, he saw "blood on [the victim's] face and around his head." He realized that the victim was dead.

The Defendant attempted to go inside of the mobile home and call the police, but upon his saying "I'm leaving," Ms. Simo pointed the gun at him and said that "if [he] didn't

help her that she would hurt [him] and [his] family." Ms. Simo wanted him to "drag [the victim] [] into the woods and to conceal [the victim] in leaves and tree limbs." He moved the victim as directed.

After moving the body, the Defendant and Ms. Simo went into the mobile home, and he felt "scared" and "terrified." Ms. Simo told the Defendant that he was leaving with her, and the two went to Walmart in Ms. Simo's car. Ms. Simo kept the gun "on the left side of the car" for the entirety of the ride. She instructed him to go into Walmart and purchase drinks and food. The Defendant testified that he could not find his phone in his pocket and that he did not consider telling anyone in Walmart about the victim because he was "in a trance like state." Ms. Simo then stopped at a gas station and kept the gun on her hip. She instructed the Defendant to use her cell phone to call Ms. Martin and ask if she had seen the victim. The two drove to a garage between 7:30 and 8:00 p.m. While there, Ms. Simo instructed the Defendant to text message B.S. using his phone and tell her that he and the victim went into the woods and that the victim "came at" him with a handgun. The Defendant testified that he complied because Ms. Simo threatened to shoot him or his mother. Ms. Simo drove the Defendant home around 9:00 p.m., and he asserted that he had no further contact with Ms. Simo.

The Defendant recalled that once home, he showered and called B.S. He told B.S. the same story about the victim's attacking him in the woods. The next day, while searching his closet for a gift he purchased for B.S., the Defendant found the victim's nine-millimeter handgun wrapped in a green blanket. He testified that Ms. Simo stashed the gun and that he "panicked" and attempted to sell the firearm to Mr. Roman. Mr. Roman refused to buy the gun, and the Defendant re-wrapped the gun in the blanket and placed it in a bin.

The following Monday, Lieutenant Wall came to the Defendant's residence to ask about the missing victim. He testified that he "wanted to tell [Lieutenant Wall] what had really happened, but [he] panicked … got scared[.]" He did not provide much information. Lieutenant Wall came back to the Defendant's residence a few days later and performed a "walk around the house" and found the victim's body. The handgun was discovered in the Defendant's bedroom.

The Defendant testified that he received his discovery materials upon first being incarcerated. He asserted that he was Mr. Armstrong's cellmate for only a "month or two" and that he did not open his discovery materials while rooming with Mr. Armstrong. He did admit that the two briefly discussed the Defendant's charge of first-degree premeditated murder, but he denied having conversations with Mr. Armstrong about the underlying facts of his case.

Following closing arguments and deliberations, the jury found the Defendant guilty of second-degree murder.

A sentencing hearing was held on December 4, 2019. At the hearing, Ms. Martin testified that the Defendant had been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), Oppositional Defiant Disorder ("ODD"), and Intermittent Explosive Disorder ("IED") at an early age. She also asserted that the Defendant was on medication for juvenile Bipolar Manic-Depressive Disorder. The Defendant had received inpatient care at Middle Tennessee Health Institute and Oak Plains Youth Academy. She stated that the Defendant was intermittently on and off of his medications by his own choice and that he would make "[b]ad judgments sometimes."

Stephanie Strader, the Defendant's sister, testified that she had a close relationship with the Defendant and that he sometimes "didn't make the right decisions." She agreed that the Defendant's multiple diagnoses affected his decision-making ability.

Following the testimony, the State argued that enhancement factors (5), (7), and (9) of Tennessee Code Annotated section 40-35-114 should be applied. Relative to factor (5), the State argued that the Defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the crime because the Defendant shot the victim once, moved closer to the victim, and administered a second gun shot. Regarding factor (7), the State argued that the offense was committed to gratify the Defendant's desire for pleasure, and the State referenced the "very reasonable inference that [the Defendant] committed this murder so he could go off with Ms. [Simo], unimpaired and unhindered[.]" Finally, in accordance with factor (9), the State argued that the Defendant possessed or employed a firearm or other deadly weapon during the commission of the offense.

The Defendant argued that the court should apply Tennessee Code Annotated section 40-35-113 mitigating factors: (4) that the defendant played a minor role in the commission of the offense; (6) that the defendant, because of youth or old age, lacked substantial judgment in committing the offense; (8) that the defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense; and (12) that the defendant acted under duress or under the domination of another person, even though the duress or the domination of another person is not sufficient to constitute a defense to the crime. The Defendant argued that "because of youth, [he] lacked substantial judgment in committing the offense." Additionally, he argued that his mental health diagnoses impeded his ability to make decisions.

The court ruled that enhancement factor (5) was applicable because the victim was shot twice. Relying on the Defendant's testimony, the court also applied factor (7) regarding the Defendant's relationship with Ms. Simo. Finally, the court applied factor (9) because the Defendant employed a firearm to shoot the victim.

The court did not apply mitigating factors (4), (6), or (8). Likewise, the court did not apply factor (12) because it did not find the Defendant's testimony to be credible. The Defendant was sentenced to twenty years.

# ANALYSIS

On appeal, the Defendant argues that the trial court abused its discretion when it applied enhancement factors (5) and (7) and when it failed to apply mitigating factors (4), (6), and (12). The State responds that the trial court did not abuse its discretion.

When an accused challenges the length of a within range sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; (7) any statement the defendant wishes to make on the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5); Carter, 254 S.W.3d at 344. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Tenn.

Code Ann. § 40-35-210(d)-(f); Carter, 254 S.W.3d at 342-43. Moreover, misapplication of an enhancement or mitigating factor no longer "invalidate[s] the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. Accordingly, this court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10.

Here, the Defendant argues that enhancement factor (5), that the Defendant treated, or allowed the victim to be treated, with exceptional cruelty during the commission of the offense, and enhancement factor (7), that the offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement, should not have been applied. See Tenn. Code Ann. § 40-35-114. During sentencing, the trial court referenced testimony from "various sources" to support the application of factor (5). This testimony included that of B.S. and Mr. Armstrong that the Defendant shot the victim twice. See State v. Walton, No. W2019-01762-CCA-R3-CD, 2020 WL 4919875, at *12 (Tenn. Crim. App. Aug. 20, 2020) (finding that application of factor (5) in a case with "numerous fatal shots at the victim, first in the back and then, after consideration, in the chest, from a close range" was not error).

Relative to the application of factor (7), the Court referenced testimony from the Defendant that "there was an unusual love triangle going on" and that he denied shooting the victim. The court found an inference that he committed the crime so that he could later be with Ms. Simo and applied factor (7). See State v. Kissinger, 922 S.W.2d 482, 490 (Tenn.1996) (applying factor (7) not error when "an offender [] steals because of [] pleasure;" "The focus is the offender's motive, not the eventual result"). The application of both factors complies with the purposes and principles of the 1989 Sentencing Act and both are supported by the record. Moreover, the trial court applied enhancement factor (9), that the Defendant employed a firearm, and the Defendant does not challenge application of this factor. Additionally, the trial court imposed a mid-range sentence of twenty years after applying enhancing factors. The court did not err in its application of enhancing factors.

The Defendant also argues that the trial court should have applied mitigating factors (4), that the Defendant played a minor role in the commission of the offense; (6), that the Defendant, because of youth or old age, lacked substantial judgment in committing the offense; and (12), that the Defendant acted under duress or under the domination of another person, even though the duress or the domination of another person is not sufficient to constitute a defense to the crime. See Tenn. Code Ann. § 40-35-113. The court refused to apply factor (4) because it did not accept the Defendant's story that Ms. Simo forced him to move the victim's body after she committed the murder. Similarly, because the court did not find the Defendant's testimony to be credible, it refused to apply mitigating factor

(12).  The court did not credit the Defendant's testimony that he acted under duress because Ms. Simo threatened him or his mother with a gun.

Additionally, the court properly refused to apply factor (6), that he lacked substantial judgment because youth, because the Defendant's mother testified that the Defendant refused to take his medication or stay in treatment after he was out of her care, and it did not find that he lacked substantial judgment.  Similarly to the court's application of enhancing factors, the court did not err by not applying the foregoing mitigating factors.

## CONCLUSION

In accordance with the foregoing, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE
